W. L. POWELL, Respondent, v. D. L. BATCHELOR, et al., Appellants.

Kansas City Court of Appeals, October 4, 1915.

1. CONTRACTS: Silent Party. Where one party executes a contract acting for himself and for another, the opposite party can, upon a breach thereof, sue both, even though the name of the other does not appear in said contract.

2. **AGENCY: Insanity of Principal: Termination of Agency.** Where a principal has created another his agent coupled with an interest in the subject-matter of the agency, the after occurring insanity of the principal does not have the effect of terminating the agency.

3. **PRACTICE: New Trial: Discretion of Trial Court in Granting.** Where, in a suit for damages for breach of a contract, the evidence showed substantial damages and the jury returned a verdict for only ·nominal damages, the trial court was strictly within its rights when it set the verdict aside and granted a new trial. The trial court's discretion to grant a new trial should not be interfered with by an appellate court unless that discretion has been clearly abused.

4. ————: ————: ————. If there is any substantial basis for the granting of a new trial it will be upheld. If, however, the case is such that no verdict in favor of the party to whom the new trial is granted could be allowed to stand, then the order granting a new trial will be reversed.

5. **EVIDENCE: Damages: Value of Business.** Where the suit is for damages for the wrecking of an alleged prosperous business, evidence as to the real value and extent of that business offered by defendant to show that it was small and unprofitable at the time he took charge is admissible as bearing on the amount of damages plaintiff has sustained.

Appeal from Jackson Circuit Court.—*Hon. Frank G. Johnson*, Judge.

AFFIRMED.

*Williams, Hunter & Griffin, E. D. Ellison* and *James C. Williams* for appellants.

*Cook & Gossett* for respondent.

TRIMBLE, J.—This suit is for damages for breach of a written contract concerning the assets, stock, and business management of a corporation called the Investment Security Company. The contract is dated December 17, 1909, and, by its terms, is between plaintiff and the defendant, D. L. Batchelor, but the

petition charges that the latter was acting for himself and as agent for his co-defendant, James P. Batchelor.

It seems that sometime in October, 1909, D. L. Batchelor, who for years had been the station agent for the Santa Fe Railroad at Las Vegas, New Mexico, came to Kansas City to look after some business for his brother, James P. Batchelor. While in the city he became acquainted with plaintiff through an advertisement of the latter's concerning the business (and the opportunity of securing an interest therein), of the Investment Security Company. This was a corporation organized under the laws of Missouri, in 1904, as the Powell-Moore Realty Company, but which had shortly thereafter changed its name to that it now bears. Originally its capital stock was $10,000 but this had been increased to $35,000. At the time Batchelor's attention was called to the company, all its stock was practically owned and controlled by the plaintiff. It was then maintaining what appeared to be an extensive and profitable real estate brokerage and rental business. Its office occupied five or six rooms, and presented an imposing appearance fitted up with desks, furniture, filing cases, cabinets, maps and all the paraphernalia usually found in a large and prosperous business of that kind. It was also imposingly organized, having a legal department, in charge of an ex-judge from Leavenworth, a rental department, a real estate department, a "business chance" department, a "stock-selling" department and perhaps others. The five or six men who worked under the company did so on a plan by which each man obtained what business he could and divided his commissions with the company. The personnel of these men changed from time to time, some going out others taking their places.

Whether the company really had a valuable and extensive business or was a mere pretentious shell does not definitely appear for reasons which will be hereinafter stated. Evidently, however, plaintiff must

have made Batchelor some very flattering representations in regard thereto, judging from the stipulation for the release of Powell from liability on account thereof contained in the contract sued on and which will be set forth later. At any rate, Batchelor desired to purchase an interest in the corporation but thought the capital stock was larger than necessary. Thereupon Powell reduced the capital stock to $12,000. Whether this was done regularly as provided by statute or merely by "unanimous consent" does not appear. It was done, and thereupon Batchelor bought of Powell one-half of the stock paying therefor the sum of $6000. This money, for some unexplained reason, was not paid to Powell but went into the treasury, and a little over one-third of it seems to have been checked out by Powell to pay old debts of the company.

Batchelor went into the corporation the latter part of October, 1909, and was made president while Powell was elected secretary and treasurer. The business was conducted by both of them from that time until December 17, 1909. At that date trouble had been brewing for some time between Powell and Batchelor. The latter was claiming that Powell had fraudulently misrepresented the condition of the company to him, and Powell was perhaps objecting to the unauthorized withdrawal by Batchelor of $4200, the amount remaining in the treasury of the $6000 Batchelor had paid in. Matters being in this condition, the contract sued on was entered into on the date last above mentioned. It recited that, whereas Batchelor and Powell were the joint owners of The Investment Security Company, and Batchelor was dissatisfied, therefore, Powell agreed to turn into the company's treasury a farm of 120 acres in Greene county, and withdraw entirely from the management of the business. He also guaranteed that the liabilities of the company at that time (aside from mortgages on real estate), did not exceed the sum of $1500. Batchelor agreed and bound

himself to pay said liabilities, to continue the business under the same name for a period of six months, during which time Powell was to have the option of buying Batchelor's interest at the price of $6000. Batchelor further agreed not to sacrifice any of the money or assets of said company without Powell's consent, to maintain said business in good running order, keeping its expenses paid and obligations promptly met during said six months, so that Powell might have an opportunity to get others interested with him in finally taking over the business, or so that a reasonable sale of said business would be possible at any time during that period. It was further provided that said Powell was released from any and all obligations of any kind whatever and absolved from any alleged liability regarding any previous representations of every kind; that the stock then held by both parties, or either of them, should be offered for sale, and, when any was sold, the proceeds were to be applied to the purchase of Batchelor's stock, and if said Batchelor failed to receive $6000 within six months, then Powell was to forfeit all interest in the company and its assets. Powell also agreed to assign his $6000 of stock to said Batchelor pending the final completion of this contract.

Pursuant to the execution of this contract, Powell deeded the Greene county farm to the company (subject to incumbrances aggregating $1500 with interest accrued thereon since the summer and fall of 1909), assigned his stock to Batchelor, turned over the entire management of the business to him, and engaged in another business. Batchelor carried on the business from December 17, 1909, until the 30th of March, 1910. He says that during this time, although he cut down expenses as low as he could, the business was conducted at a loss of $150 per month.

According to Batchelor's testimony he called on Powell about March 20, 1910, and asked him if he desired to exercise the option contained in their contract,

and Powell told him he did not as he had no intention of ever embarking in that business again. Thereupon, on March 30, 1910, Batchelor caused the corporation to deed the Greene county farm to Blanche Batchelor, wife of James P. Batchelor. He also caused the company to transfer a twenty-five-foot lot on Jackson avenue in Kansas City to his son, C. D. Batchelor, and to turn over to C. D. Batchelor and J. H. Batchelor, son of J. P. Batchelor, certain stock in the Automatic Rapid Mail Service Company; a corporation organized to manufacture and sell a device for picking up mail sacks by railway trains when going at high speed. This device, however, had not been approved by the United States Government and its value depended wholly upon that approval. The recipients of these pieces of property and shares of stock paid nothing to the company for them. On the same day, said D. L. Batchelor made a conditional sale of three-fourths of the capital stock of the Investment Security Company to three men who were then in the company's offices, retaining a one-fourth interest himself. It was provided in this contract of sale that Batchelor would hold the purchasers harmless from anything growing out of the contract between him and Powell, but it was further provided that in case Powell chose to exercise his option thereunder, then said purchasers of said capital stock would assign their respective stock in accordance therewith and Batchelor would pay them back the consideration he had received from them plus twenty per cent profit, they to have all the earnings of the company that might accrue in the meantime. Batchelor then turned the corporation, its offices and furniture, over to these men and returned to Las Vegas.

The answer filed in behalf of James P. Batchelor denied that he was a party to said contract or that he was in any way bound thereby. The defendant, D. L. Batchelor, admitted the execution of the contract on his part, but denied that in doing so he was acting in

any way for James P. Batchelor. He also set up that
he was induced to purchase his $6000 of stock in the
corporation by the false and fraudulent representa-
tions of the plaintiff (upon which he relied) that the
corporation was solvent, had a good paying business
with assets worth $12,000, when in fact it was not sol-
vent, did not have a paying business, and its assets con-
sisted only of a few hundred dollars. His answer fur-
ther alleged that, on the representation of plaintiff
that the liabilities of the corporation on December 17,
1909, was only $1500 (aside from mortgages on real
estate), he *bought and paid for* plaintiff's 600 shares
of the corporate stock, but that such representation was
false and fraudulently made and known to be so by
plaintiff, but relied upon and believed to be true by de-
fendant, who thereupon assumed and agreed to pay
said liabilities; that in fact said liabilities amounted
to $2017.34 which defendant was required to and did
pay, thus making defendant expend the sum of $517.34
in excess of the $1500 represented by plaintiff to be
the full amount of said liabilities, for which sum of
$517.34 with interest defendant prayed judgment on
his counterclaim.

The jury returned a verdict assessing damages in
the sum of one dollar against both defendants on plain-
tiff's petition, and for defendant, D. L. Batchelor, in
the sum of $578.34 on his counterclaim.

A motion for new trial filed by plaintiff was sus-
tained, the trial court assigning as a reason therefor
that "under the law and the evidence the verdict for
the plaintiff on the cause of action set up in the petition
is insufficient and inadequate and should have been for
a substantial sum." Whereupon, the defendants ap-
pealed.

The first contention to be disposed of is that there
is no evidence to connect James P. Batchelor with the
contract. This claim is untenable. There was evi-
dence tending to show that D. L. Batchelor was James

P. Batchelor's general agent; that the money with which half of the stock was originally purchased by D. L. Batchelor belonged to James P. Batchelor, and that the latter gave the former full authority to act for him in reference to such stock and the affairs of the company and left the whole matter of his investment therein to D. L. Batchelor to settle as the latter might think best. The name of James P. Batchelor did not appear in the written contract but, of course, this makes no difference if D. L. Batchelor was in fact acting for himself and James P. Batchelor. [Mechem on Agency, sec. 701.] It is true James P. Batchelor became insane on the 21st of February, 1910, and was placed under guardianship and appears in this case by his guardian, Charles C. Hoefer. But the authority given by James P. Batchelor to his brother, D. L. Batchelor, was conferred prior to such insanity, and all the acts and declarations of James P. Batchelor offered in evidence by plaintiff to show such authority were matters that occurred prior to February 21, 1910; and while D. L. Batchelor's acts in disposing of the assets of the company as complained of in the petition, occurred March 10, 1910, that is, after James P. Batchelor became insane, yet such insanity did not have the effect, under the circumstances of this case, to terminate D. L. Batchelor's authority or to release James P. Batchelor from liability for the acts of his said agent. [Hill v. Day, 34 N. J. Eq. 150; Matthiesson v. McMahan, 38 N. J. L. 536; Davis v. Lane, 10 N. H. 156.] The record shows that the court sustained the objection to Powell testifying to any acts or declarations on the part of James P. Batchelor tending to show that D. L. Batchelor was his agent, and allowed only disinterested parties to testify thereto. Consequently, the evidence tending to show James P. Batchelor's connection with the contract or cause of action in issue and on trial did not come under the ban of section 6354, Revised Statutes 1909. Under the foregoing circum-

stances, therefore, the demurrer offered in behalf of James P. Batchelor was properly overruled.

This point being disposed of it is not seen how we as an appellate court can reverse the action of the trial court in granting a new trial.

Under the contract in question, Powell was entitled to have Batchelor carry on the business, in its then condition, for six months from December 17, 1909, and carefully preserve its assets, so as to enable him, Powell, within that time, to find some one who could advance the six thousand dollars necessary to pay for Batchelor's stock. It would seem that under the contract Powell had this right not only to enable him to get a purchaser for the Batchelor stock but also, if possible, to sell all of the stock and receive for his own stock everything over and above the $6000 going to Batchelor. If so, then he had the right to insist on Batchelor's performance of the contract for the full period of six months even if he himself did not intend personally to go back into the business. But, however this may be, Batchelor's claim that Powell told him he did not intend to exercise any option under the contract was not pleaded as a defense either by way of estoppel or otherwise. And even if it had been, it was denied by Powell and thus an issue was made for the jury which found for plaintiff but allowed him only the sum of $1. Now the evidence shows, without dispute, that the corporation had assets of more than a mere nominal value. The property owned by it may have consisted largely of "chips and whetstones" and the value of its business and the vastness of its clientele may have been greatly exaggerated by the testimony adduced in plaintiff's behalf. If we were passing on the matter, with our conservative ideas of such things, we might incline to the view that they were. But even if this be so, the furniture in the office, the cash on hand and the equities in the scattered pieces of real estate were worth a substantial amount. How much, we

would not undertake to say, but certainly more than a merely nominal sum. Batchelor admits the execution of the contract and that he disposed of the property, refused to continue the business and turned it over to others before the expiration of the six months. He neither pleaded nor proved any defense for so doing. We say he did not prove any defense because the jury found against him. But it found only nominal damages, when there was substantial evidence that the damages were more than that. Hence the court was strictly within its rights when it set the verdict aside. [Morris v. Missouri Pacific R. Co., 136 Mo. App. 393; Noble v. Kansas City, 222 Mo. 121.] The trial court's discretion to grant new trials should not be interfered with by an appellate court unless that discretion has been clearly abused. [Hoepper v. Southern Hotel Co., 142 Mo. 378, l. c. 387.] If there is any substantial basis for the granting of a new trial, it will be upheld. [FitzJohn v. St. Louis Transit Co., 183 Mo. 74.] Of course, if the case is such that no verdict in favor of the party to whom the new trial is granted could be allowed to stand, then the order granting a new trial will be reversed. [Ottomyer v. Pritchett, 178 Mo. 160.] Clearly the case at bar does not present a situation where the court's order sustaining the motion for new trial can be interfered with.

Whether the offer of Brown to buy the Batchelor stock at $6000 was a mere "bluff" or pretense "framed up" by Powell, as claimed by defendants, in order to give some semblance of great loss on his part, or was a genuine opportunity for Powell to re-enter the company and get back his own stock, had the business been kept intact as required by the contract, need not be decided here. Doubtless there are some suspicious circumstances connected with it. But at that time Batchelor had already violated the contract and put it out of his power to perform, and thus Powell was deprived of the opportunity, during the remainder of the

time the contract gave him, of redeeming his stock and again obtaining possession of the property.    Under such circumstances it would be no defense on Batchelor's part to say that Powell would not have found a purchaser any way, though, of course, the value of the assets and business at the time they were turned over to Batchelor, and the consequent probability of Powell being able to find a purchaser, and the question of whether Brown's offer was genuine or a "frame up," would all have a bearing upon the amount of damages sustained.   We cannot say that the evidence offered by plaintiff tending to show that his loss was substantial was no evidence at all, or that the court acted arbitrarily in granting a new trial.   Consequently the case does not come within an exception to the general rule that the trial court's discretion in granting a new trial will not be interfered with.

As the case will have to be tried again it may be well to observe that since the contract in question released Powell from all liability for any representations made to Batchelor at the time he first bought in, and was a settlement of their differences at that time, evidence of such representations was properly excluded. However, we think the court unduly limited the evidence in not allowing Batchelor to state and show the actual value and extent of the business of the company at the time he first bought in, and whether it was then in reality making or losing money as compared with its extent and value during the time he managed the business and at the time he sold out and quit.  Powell was suing for $12,500 damages for the alleged depreciation in the value of his stock put up as a forfeit in the hands of Batchelor under the contract, claiming that such stock had been rendered worthless by Batchelor's conduct in dissipating the assets and destroying and rendering unprofitable an otherwise prosperous business. Under the circumstances, Batchelor should have been

allowed to show that the business he is charged to have ruined was not in fact prosperous or valuable.

Upon the grounds hereinbefore stated the judgment is affirmed. The other judges concur.